UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LATEASE RIKARD, individually and on behalf of others similarly situated, | ) ) ) |
| Plaintiff(s), | ) ) |
| vs. | ) ) Case No. 4:11CV1580 JCH |
| U.S. AUTO PROTECTION, LLC, et al., | ) ) ) |
| Defendant(s). | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment on the Issue of Individual Liability as to Defendants Ray Vinson, Jr., Shawn Vinson and Matthew McLain, filed June 3, 2013. (ECF No. 276). The motion is fully briefed and ready for disposition.

## BACKGROUND

Defendants U.S. Auto Protection, LLC, and U.S. Auto Warranty, LLC, are Missouri limited liability companies.[1] (Plaintiffs' Second Amended Complaint ("Complaint" or "Compl."), ¶¶ 8-9). According to Plaintiffs, Defendants Ray Vinson, Jr. ("Ray Vinson"), Shawn Vinson, and Matthew McLain were officers or members of USAP, and possessed control over the hiring and firing practices, pay practices, and overall operational functions of the entities. (Id., ¶¶ 10-12).

---

[1] When Ray Vinson, Jr. and Shawn Vinson first became members and owners of the Defendant company, it was called U.S. Auto Warranty, LLC. (Statement of Uncontroverted Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of Individual Liability as to Defendants Ray Vinson Jr., Shawn Vinson and Matthew McLain ("Plaintiffs' Facts"), ¶ 1 n. 1). Subsequently, and while the Vinsons were still owners and members, the company became known as U.S. Auto Protection, LLC. (Id.). For purposes of this Memorandum and Order, the corporate entity, including the combination of U.S. Auto Warranty, LLC, and U.S. Auto Protection, LLC, will be referred to as "USAP."

From approximately January through May, 2011, named Plaintiff Latease Rikard was one of many sales representatives employed by USAP at its call center in Chesterfield, Missouri. (Compl., ¶¶ 1, 5). Plaintiffs maintain Defendants employed sales representatives to "pre-screen" and "close" telephone sales of vehicle service contracts, which were essentially extended automobile warranties.[2] (Id., ¶¶ 1, 17). According to Plaintiffs, Defendants did not pay their sales representatives based on the number of hours they worked per week, but instead utilized a commission-based pay scheme, with a weekly or monthly minimum payment. (Id., ¶ 17). Plaintiffs further state that sales representatives were not required to track or record the hours they worked in any way, and that USAP had no system in place for doing so. (Id., ¶ 18).

Plaintiffs allege sales representatives frequently worked in excess of 40 hours in a given workweek, as they often were required to work before and/or after their designated shifts, through some lunch periods, and on certain Saturdays. (Compl., ¶ 19). Plaintiffs assert Defendants refused to pay the proper overtime pay of one-and-a-half times the regular hourly rate of pay for this excess work, and that this deliberate failure on the parts of Defendants violated the Fair Labor Standards Act ("FLSA") and Missouri law. (Id., ¶¶ 20, 21).[3] Based on this alleged wrongdoing, Plaintiffs filed their Complaint on April 20, 2012, asserting claims for violations of the FLSA (Count I) and the Missouri Minimum Wage Law ("MMWL") (Count II), and unjust enrichment (Count III).

Subsequent to filing their Complaint, Plaintiffs timely petitioned the Court for an order granting conditional certification of the case as a collective action under § 216(b) of the FLSA, and authorizing them to send notice to all current and former sales representatives who had worked for

---

[2] Plaintiff Rikard worked as both a pre-screener and a closer at various times during her employment with USAP in 2011. (Compl., ¶ 5).

[3] Plaintiffs further maintain Defendants' failure accurately to record all time worked by their sales representatives violated the FLSA and Missouri law. (Compl., ¶ 22).

Defendants in the last three years. In an Order entered December 23, 2011, the Court conditionally certified the class for purposes of Count I of the Complaint[4], and tailored the possible class of opt-in Plaintiffs to "include only those persons that worked for Defendants as sales representatives . . . from September 13, 2008[,] to September 13, 2011." (ECF No. 37, P. 11).[5] In conditionally certifying the class, the Court found that Plaintiffs had submitted allegations sufficient to clear the relatively low hurdle of showing that potential class members were co-victims of Defendants' pay practices. (Id., P. 8). The Court also determined that a three-year statute of limitations was appropriate for the FLSA claim, stating that "Plaintiffs . . . produced sufficient evidence that Defendants either knew or showed reckless disregard for the matter of whether its [*sic*] conduct was prohibited by statute." (Id., P. 10).

On November 30, 2012, the Court certified a Rule 23(b)(3) class for Counts II and III of Plaintiffs' Complaint. (ECF No. 213). The class consists of all individuals who were employed by Defendants as non-supervisory call center employees at any time during the relevant statute of limitations.

As stated above, Plaintiffs filed the instant Motion for Partial Summary Judgment on June 3, 2013, requesting that the Court hold that individual Defendants Ray Vinson, Shawn Vinson and Matthew McLain were "employers" under the FLSA and MMWL, and thus may be held

---

[4] Although the Court's December 23, 2011, Order was directed to Plaintiffs' First Amended Complaint, the only change in the Second Amended Complaint was the addition of individual Defendants Brian Schatzberg, Paul Benenati, Josh Markert, and Ben Deverger, each of whom has since been dismissed or settled. (See ECF Nos. 160, 161, 171, 339).

[5] In a subsequent Order entered January 19, 2012, the Court reconsidered the aforementioned timeframe and decided that "the conditionally certified class shall include only those persons that worked for Defendants as sales representatives . . . from December 14, 2008[,] to December 14, 2011." (ECF No. 41, P. 2).

individually, jointly and severally liable for all damages owed as a result of any eventual judgment in favor of Plaintiffs.  (ECF No. 276).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255.  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## DISCUSSION

The FLSA defines an "employer" as, "any person acting directly or indirectly in the interest of an employer in relation to an employee..."  *See* 29 U.S.C. § 203(d).[6]  Furthermore, "person" is defined under the FLSA as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  *See* 29 U.S.C. § 203(a).  There may be multiple simultaneous employers under the FLSA, and recovery for FLSA violations is possible against all defendants found to be "employers."  *Perez-Benites Candy Brand, LLC*, 2011 WL 1978414, at *5, 6 (W.D. Ark. May 20, 2011).

"A determination of whether an individual is an employer within the meaning of the FLSA is not governed by formalistic labels or a common law notion of the employment relationship."  *Perez-Benites*, 2011 WL 1978414, at *8, citing *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983).  "Rather, the focus is on the totality of the circumstances of whether the individual in question is sufficiently involved in the day-to-day operations of the corporation."  *Id.* (citation omitted).  The First Circuit has identified several economic factors relevant to the analysis, "including the individual's ownership interest, degree of control over the corporation's financial affairs and compensation practices, and the role in causing the corporation to compensate or not compensate employees in compliance with the FLSA."  *Saunders v. Ace Mortg. Funding, Inc.*, 2007 WL 4165294, at *4 (D. Minn. Nov. 16, 2007), citing *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 677-78 (1st Cir. 1998).  "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  *Solis v. Hill Country Farms, Inc.*, 808 F.Supp.2d 1105, 1115 (S.D. Iowa 2011) (citation omitted).

---

[6] "Employer" similarly is defined under the MMWL, as, "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *See* Mo.Rev.St. § 290.500(4).

With these standards in mind, the Court turns to a consideration of employer liability as to each individual Defendant.

**A.    Ray Vinson**

In his response to Plaintiffs' motion, Ray Vinson asks the Court to find that he was not Plaintiffs' employer, because he never utilized his ability to exercise control over them.  *See* Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment on the Issue of Individual Liability as to Defendants Ray Vinson Jr., Shawn Vinson and Matthew McLain ("Defendants' Response"), P. 9 (citations omitted) ("[Plaintiffs] disregard the general propositions that *unexercised* authority over plaintiff-employees is insufficient to establish liability as an employer and that merely assenting to or concurring in another's decision--even one that is crucial to the plaintiffs' position--is not, itself, an exercise of authority.").  The Court's review of the record before it, however, yields a different outcome.

Ray Vinson was the Managing Member and CEO of USAP from November 17, 2009, until the company went out of business in October, 2011.  (Plaintiffs' Facts, ¶ 1).  He first acquired an interest in the company on November 17, 2009, when he and Shawn Vinson signed and agreed to the Amended and Restated Operating Agreement of U.S. Auto Warranty, LLC (hereinafter "Operating Agreement").  (Id., ¶ 11).  As a result of that execution, each Vinson owned 25.5 percent of USAP, and thus collectively the Vinsons owned a controlling interest in the company.  (Id.).  Ray Vinson subsequently acquired additional ownership shares, and by May 12, 2010, he was the majority owner, with a 53.67 percent interest in the business.  (Id., ¶¶ 14-17).[7]

---

[7] When Ben Deverger left USAP, Ray Vinson bought his shares of the company as well.  (Plaintiffs' Facts, ¶ 22).

As Managing Member of USAP, Ray Vinson possessed the authority and power to manage all aspects of the business. (Plaintiffs' Facts, ¶ 2). This authority included the ability to set pay policies, determine pay rates of employees, and hire, fire and discipline USAP employees. (Id., ¶¶ 2, 3). While CEO and Managing Member of USAP, Ray Vinson admittedly was aware of overtime laws regarding the forty hour workweek, and the requirements to pay time and one-half for overtime worked. (Id., ¶ 23).[8]

By the middle of 2010, Ray Vinson was increasingly involved with USAP, as the company was continuing to lose money despite an influx of spending. (Plaintiffs' Facts, ¶ 18). Ray Vinson had an office with a computer at the USAP location, and possessed a USAP e-mail address. (Id., ¶¶ 8, 9). He was present at the USAP location as often as three or four times per week, and attended marketing meetings, meetings with USAP accountants, collaborative meetings regarding company policy, and manager meetings, during which he handed out bonus checks to managers. (Id., ¶¶ 5, 7, 10). He addressed the entire USAP staff on the production floor at times, and offered rides in his helicopter as an incentive to sales representatives for meeting sales goals. (Id., ¶¶ 5, 6).

On January 8, 2011, Ray Vinson sent an e-mail to USAP employee Paul Benenati, stating as follows:

THATS UNACCEPTABLE!!!!!!!!!

I INSTRUCTED YOU TO HAVE A CLASS ON THE 10TH WHEN WE WERE GETTING AN ENORMOUS AMOUNT OF RESPONSES TO THE AD.

I HAVE MENTIONED IT TO YOU ON MORE THAN ONE OCCASION.

---

[8] Ray Vinson maintains that while he was aware of the overtime laws, he never assumed responsibility for ensuring compliance therewith, instead relying on Paul Benenati and Ben Deverger to perform that function. (Defendants' Response to Plaintiffs' Facts, ¶ 23).

>I UNDERSTAND THAT YOU LEFT APPLICANTS IN THE LOBBY THIS WEEK WAITING FOR YOU TO SHOW UP TO WORK WITH NO CALL FROM YOU TO OFFICE.
>
>YOU LEFT AN ENTIRE TRAINING CLASS WAITING FOR YOU THIS WEEK AS YOU WERE A "NO SHOW" UNTIL LATER, TO WORK AND BEGIN THE CLASS AS YOU WERE SCHEDULED TO DO.
>
>I SPECIFICALLY MET WITH YOU LAST WEEK AND WARNED YOU NOT TO DO THIS AGAIN AS YOU HAVE DONE THIS EXACT THING IN THE PAST.. YOU MAKE THE COMPANY LOOK BAD WHEN YOU DO NOT SHOW AND A ROOM FULL OF NEW EMPLOYEES ARE AWAITING YOU, AS YOU HAVE REPEATEDLY DONE.
>
>ALTHOUGH YOU HAVE AN OWNERSHIP INTEREST IN THE COMPANY; YOUR JOB IS ON THE LINE AND I AM CONSIDERING FIRING YOU.
>
>IT IS IMPERATIVE THAT YOU GET THESE APPLICANTS ON THE PHONE AND SCHEDULE AT LEAST 20 PEOPLE TO START IN THAT TRAINING CLASS ON MONDAY.
>
>IF YOU CANNOT I WILL GET SOMEONE WHO WILL!!!!!!!
>
>I WILL NO LONGER TOLERATE YOUR CONTINUED DISRESPECT FOR ME AND THIS COMPANY'S PRESENCE.
>
>IF YOU FEEL YOU WANT TO TENDER YOUR RESIGNATION NOW I AM PREPARED TO REPLACE YOU NOW.
>
>I WANT CONSTANT COMMUNICATION TO ME ON YOUR PROGRESS OR YOUR RESIGNATION WITHIN AN HOUR OR 10:22 CST.
>
>PLEASE ADVISE,
>RAY

(Plaintiffs' Facts, ¶ 19, citing Plaintiffs' Exh. 6).  Ray Vinson sent a follow-up e-mail to Paul Benenati later that day, stating as follows:

>YOU ARE GETTING YOUR OPPORTUNITY TO EARN MY TRUST BUT UNDERSTAND YOU ARE ON VERY THIN ICE WITH ME.
>
>AGAIN
>
>GET THAT CLASS BUILT FOR MONDAY AND LET ME KNOW YOU HAVE IN ORDER..........ASAP

- 8 -

(Id., ¶ 20, citing Plaintiffs' Exh. 6).

By January 11, 2011, Ray Vinson had made the decision to separate Paul Benenati from USAP. (Plaintiffs' Facts, ¶ 21). Ray Vinson further unilaterally made the decision to close USAP entirely later in 2011. (Id., ¶ 4).[9]

Upon consideration, the Court has little trouble finding Ray Vinson qualifies as an employer within the meaning of the FLSA and MMWL. *See Solis v. FirstCall Staffing Solutions, Inc.*, 2009 WL 3855702, at *6 (W.D. Mo. Nov. 18, 2009). Ray Vinson was a significant owner of USAP, maintaining over fifty percent ownership throughout much of the time period in question. *Solis*, 808 F.Supp.2d at 1116. He further had the power to control, and actually controlled, significant aspects of the company's day-to-day functions, as he attended marketing meetings, met with USAP accountants, handed out bonus checks to managers, disciplined and ultimately terminated Paul Benenati, and eventually decided to close the company. *Id.* Thus, despite the fact that Ray Vinson may have delegated some aspects of the day-to-day functions of USAP to other employees, he nevertheless was an employer of its employees under the FLSA and MMWL. *See Saunders*, 2007 WL 4165294, at *5 (internal quotation marks and citation omitted) ("Individuals may be employers without the continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control; rather, control may be restricted or exercised occasionally without removing the employment relationship from FLSA protections."). *See also Wirtz v. Pure Ice Co.*, 322 F.2d 259, 263 (8th Cir. 1963) (holding that a combination of stock ownership, management, direction and the right to hire and fire employees would "well support" a finding of employer status).

**B.** **Shawn Vinson**

---

[9] In addition to the above, Plaintiffs offer evidence that Ray Vinson was involved with the very compensation rate decisions at issue here. (See Plaintiffs' Facts, ¶¶ 68-78).

In his response, Shawn Vinson also asks the Court to find he was not Plaintiffs' employer, because although he had the ability to exercise control over them, he never utilized such authority. (Defendants' Response, PP. 15-19). Upon consideration, the Court again disagrees.

As noted above, on November 17, 2009, Shawn Vinson signed and agreed to the Operating Agreement, and as a result owned 25.5 percent of USAP. (Plaintiffs' Facts, ¶ 11). Shawn Vinson continued as an owner and member of USAP from November, 2009, until its closing in 2011. (Id., ¶ 24). In his position as President, Shawn Vinson possessed the authority to manage USAP and make decisions concerning the business of the company; to make contracts, enter into transactions, and make and obtain commitments on behalf of the company; to hire[10], fire[11], and discipline USAP employees; to set or change the pay rates of USAP employees; and to give approval for marketing expenditures of USAP. (Id., ¶¶ 25, 27-31).

Beginning in 2010, Shawn Vinson was present at the USAP office location approximately three to four days per week, and devoted as much as twenty to thirty hours per week to USAP business. (Plaintiffs' Facts, ¶¶ 36, 37). He had his own office and computer at USAP, and possessed a USAP e-mail address. (Id., ¶ 38). Shawn Vinson further attended USAP meetings, including sales meetings, meetings occurring on the sales floor, and team meetings involving a sales manager and his or her team. (Id., ¶ 32).[12] On at least two occasions Shawn Vinson called meetings himself,

---

[10] Shawn Vinson emphasized his authority to hire in a November 20, 2009, e-mail to Paul Benenati, as follows: "We are in charge now, not the administrators! We dictate, not them! Let's hire your 3 you had on standby tomorrow if possible. Keep me posted." (Plaintiffs' Facts, ¶ 39, citing Plaintiffs' Exh. 7).

[11] It is undisputed that Shawn Vinson personally fired a USAP employee on one occasion. (Plaintiffs' Facts, ¶ 29). In their response, Defendants merely clarify that the firing occurred because the employee physically assaulted Shawn Vinson on the sales floor without provocation. (Defendants' Response to Plaintiffs' Facts, ¶ 29).

[12] According to Defendants, Shawn Vinson attended only "a few" team meetings with sales representatives present, between two and ten sales manager meetings with sales managers

which were attended by sales managers, and during which business such as incoming call volume was discussed. (Id. ¶ 33). He further engaged in motivating the sales force, and on one occasion investigated allegations of workplace sexual harassment by an employee of USAP. (Id., ¶¶ 34, 35). Finally, when Ray Vinson decided to close USAP in 2011, he communicated that decision to Shawn Vinson, and together they held a meeting to inform their staff of the closing. (Id., ¶ 46).[13]

Upon consideration, the Court finds Shawn Vinson also qualifies as an employer within the meaning of the FLSA and MMWL. *See Solis*, 2009 WL 3855702, at *6. While not as extensive as his father, Shawn Vinson also maintained a significant ownership stake in USAP. *Solis*, 808 F.Supp.2d at 1116. He devoted a great deal of time to running the company, made decisions concerning the business of the company, and admittedly hired and fired employees on occasion. Under these circumstances, the Court holds that although Shawn Vinson may have delegated some aspects of the day-to-day functions of USAP to other employees, he nevertheless was an employer of its employees under the FLSA and MMWL. *See Saunders*, 2007 WL 4165294, at *5; *see also Wirtz*, 322 F.2d at 263.

**C.     Matthew McLain**

Prior to January, 2011, Defendant Matthew McLain ("McLain") was an employee of Vinson Mortgage. (Plaintiffs' Facts, ¶ 50). In or around January, 2011, McLain met with Shawn Vinson, to discuss the structuring of USAP. (Id., ¶ 52). He then met with USAP consultants and employees, in order to discuss the business plan and offer advice. (Id., ¶ 53). McLain began spending more and

---

and some of their superiors, and "maybe five to seven" meetings on the sales floor with sales representatives present. (Defendants' Response to Plaintiffs' Facts, ¶ 32). Defendants further maintain Shawn Vinson did not participate in the meetings in any substantive way. (Id.).

[13] As with Ray Vinson, Plaintiffs offer evidence that Shawn Vinson was involved with the compensation rate decisions at issue in this suit. (See Plaintiffs' Facts, ¶¶ 68-78).

more time at the USAP location, and by May of 2011, he was working full-time, or 40 plus hours per week, there. (Id., ¶¶ 54-56). McLain had his own office at the USAP location, and possessed a USAP e-mail address. (Id., ¶¶ 57, 59).

In July, 2011, McLain was hired by Ray Vinson as USAP's Vice President of Sales. (Plaintiffs' Facts, ¶ 47).[14] In that position, McLain possessed the authority to discipline and fire employees of the company.[15] (Id., ¶ 62). His job duties included increasing production, training of sales representatives, monitoring sales, assisting in marketing efforts, changing the sales approach with USAP customers, and managing/supervising the Director of Sales, Billy Held. (Id., ¶ 60). McLain further attended and participated in sales manager meetings, in which the issues discussed included changes to employees' pay structure[16] and incentives offered by the owners. (Id., ¶ 64).

On February 4 and 10, 2011, McLain sent e-mail correspondences to Jennifer Ferguson, USAP's Director of Human Resources, describing a new compensation plan for the company's set-up sales representatives. (Plaintiffs' Facts, ¶ 68). McLain communicated new compensation structures to Ferguson on April 1, 2011, and again on May 3, 2011. (Id., ¶¶ 70, 72). The May pay plan changed the compensation structure for sales representatives from draw or salary plus commissions, to hourly pay plus bonuses and commissions. (Id., ¶ 72). On August 12, 2011, McLain sent an e-mail to USAP employees Steve Laux and Nichole Barteau, announcing yet another compensation plan that eliminated the hourly compensation for sales representatives, and returned to the draw/commission pay system. (Id., ¶ 76). Prior to sending the e-mails confirming the various

---

[14] McLain remained in his position with USAP until the business closed, at which time he resumed his employment with Vinson Mortgage. (Plaintiffs' Facts, ¶¶ 49-50).

[15] The parties disagree as to whether McLain actually exercised his authority to fire USAP employees. (See Plaintiffs' Facts, ¶ 62, and Defendants' Response thereto).

[16] McLain himself gave recommendations on how USAP employees should be paid. (Plaintiffs' Facts, ¶ 63).

pay structure changes, McLain always received authorization from USAP ownership. (Id., ¶¶ 69, 71, 73, 77).[17]

Upon consideration, the Court is unable to determine whether McLain qualifies as an FLSA or MMWL employer on the record before it. See Alba v. Loncar, 2004 WL 1144052, at *6 (N.D. Tex. May 20, 2004) (citation omitted) ("The determination of whether [the individual defendant] is an employer of [the corporate defendants'] employees is a legal determination; however, that legal determination is premised on findings of historical fact."). The Court thus will deny this portion of Plaintiffs' Motion for Summary Judgment without prejudice, subject to revisiting the issue after the presentation of evidence at trial.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on the Issue of Individual Liability as to Defendants Ray Vinson, Jr., Shawn Vinson and Matthew McLain (ECF No. 276) is **GRANTED** as to Defendants Ray Vinson, Jr. and Shawn Vinson, and **DENIED** without prejudice as to Defendant Matthew McLain.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Defendants' Individual Liability (ECF No. 306) is **DENIED** as to Defendants Ray Vinson and Shawn Vinson, and **DENIED** without prejudice as to Defendant Matthew McLain.

---

[17] Defendants do not dispute that any changes in USAP pay plans had to be approved by the owners, as they possessed ultimate decision making authority regarding policy and procedure at the company. (Plaintiffs' Facts, ¶ 78).

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike the Declaration of Paul Benenati (ECF No. 388) is **DENIED** as moot.

Dated this 20th day of September, 2013.

                                                                            /s/Jean C. Hamilton
                                                                            UNITED STATES DISTRICT JUDGE